---

Case No. 11-9557

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE TENTH CIRCUIT

| | |
|---|---|
| PUBLIC SERVICE COMPANY OF NEW MEXICO, | ) ) ) |
|     Petitioner, | ) ) |
| v. | ) ) |
| UNITED STATES ENVIRONMENTAL PROTECTION AGENCY and Lisa Jackson, Administrator, UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, | ) ) ) ) ) ) |
|     Respondents. | ) ) |

---

An Original Action in the Court of Appeals, challenging
a Federal Rule found at 76 Fed. Reg. 52,388 (Aug. 22, 2011)

---

## UNOPPOSED MOTION TO INTERVENE BY DINÉ CITIZENS AGAINST RUINING OUR ENVIRONMENT, NATIONAL PARKS CONSERVATION ASSOCIATION, NEW ENERGY ECONOMY, SAN JUAN CITIZENS ALLIANCE AND SIERRA CLUB

---

## I.    INTRODUCTION

This case involves EPA's implementation of the Clean Air Act's regional haze requirements as they apply to the coal-fired San Juan Generating Station ("San Juan"), near Farmington, New Mexico.  The regional haze program requires pollution reductions from large industrial sources of pollution, such as coal-fired power plants, that impair visibility in national parks and wilderness areas.  These source-specific pollution reductions also yield important *local* co-benefits to public health, the environment, and the economy.  The aspiring intervenors[1] form a coalition of conservation and environmental justice groups ("Environmental Coalition") that is directly harmed by pollution from the San Juan Generation Station.  The Coalition's interests are not adequately protected by the existing parties.  The Environmental Coalition thus meets the requirements of Fed. R. App. P. 15(d) and Local Rule 15.2(B), and respectfully moves to intervene in support of

---

[1] Diné Citizens Against Ruining Our Environment ("Diné CARE"), National Parks Conservation Association ("NPCA"), New Energy Economy ("NEE"), San Juan Citizens Alliance ("SJCA") and Sierra Club.

1

Respondents United States Environmental Protection Agency and Administrator Lisa Jackson (collectively, "EPA") in this Petition for Review.

The petitioner, Public Service Company of New Mexico ("PNM"), has stated that it takes no position on this motion.  EPA has stated that it does not object to this motion.

## II.    REGULATORY BACKGROUND

One of the Clean Air Act's goals is to restore natural visibility conditions in the country's national park and wilderness areas by 2064. 42 U.S.C. §§ 7491, 7492; 40 C.F.R. § 51.308(d).  To attain this goal, the Act directs States to prepare state implementation plans ("SIPs") which include, *inter alia*, the imposition of best available retrofit technology ("BART") on certain major stationary sources that adversely affect visibility in national parks and wilderness areas, or so-called "Class I" areas.  40 C.F.R. § 51.308; *see also* 42 U.S.C. § 7472 (providing which areas shall be classified as "Class I" areas).

The State of New Mexico failed to meet its December 17, 2007
deadline to submit its regional haze SIP to EPA.  *See Approval and
Promulgation of Implementation Plans; New Mexico; Federal
Implementation Plan for Interstate Transport of Pollution Affecting
Visibility and Best Available Retrofit Technology Determination*, 76 Fed.
Reg. 491, 493 (proposed Jan. 5, 2011); *see also* 40 C.F.R. § 51.308(d)(1).
EPA's formal finding to that effect triggered a two-year clock for EPA to
issue a federal implementation plan ("FIP") or, in the alternative,
approve a complete regional haze SIP from New Mexico.  *Id.*; *Finding of
Failure to Submit State Implementation Plans Required by the 1999
Regional Haze Rule*, 74 Fed. Reg. 2392, 2393 (Jan. 15, 2009); *see* 42
U.S.C. § 7410(c).  Because New Mexico again failed to propose a SIP
within those two years, EPA prepared a FIP and published its proposal
for public comment on January 5, 2011.  76 Fed. Reg. 491.  After taking
public comment, EPA published a final FIP on August 22, 2011.  *See
Approval and Promulgation of Implementation Plans; New Mexico;
Federal Implementation Plan for Interstate Transport of Pollution*

3

*Affecting Visibility and Best Available Retrofit Technology Determination*, 76 Fed. Reg. 52,388 (Aug. 22, 2011).

EPA's FIP imposes limits on emissions of NOx, SO$_2$, and sulfuric acid mist.  Finding that San Juan's emissions impair visibility in sixteen national park and wilderness areas, or "Class I" areas, the FIP makes a BART determination for the plant that would limit its NOx emissions to 0.05 pounds per million British thermal units ("lbs/MMBtu"), over a rolling 30-day average.  *Id*. at 52,439.  This limit would reduce the plant's NOx emissions by more than 80%.  *Id*. at 52,389.  The FIP also limits San Juan's sulfuric acid emissions to 2.6 x 10$^{-4}$ lbs/MMBtu on an hourly basis.  *Id*. at 52,440.  The FIP requires compliance with these limits by no later than September 21, 2016.  *Id*. at 52,439.

On September 16, 2011, PNM filed its petition with this Court seeking judicial review of EPA's BART determination for San Juan. Appellate Case: 11-9557, Document No. 01018714287.

4

## III.   FACTUAL BACKGROUND

### A.   San Juan's Pollution Load

The San Juan Generating Station is a 1,800-megawatt coal-fired power plant located near Farmington, New Mexico.[2]  Built between 1973 and 1982, the plant's four units emit millions of tons of air pollution every year.[3]  Last year, this plant emitted more than 11.7 million tons of carbon dioxide, more than 4 thousand tons of sulfur dioxide and more than 15 thousand tons of nitrogen oxides, according to EPA.  *Id.*  This large-scale pollution raises serious public health and environmental concerns.

Due to its location, which is adjacent to the Navajo Nation, the plant disproportionately impacts the Navajo people, thereby raising social justice concerns as well.  The local impacts of the plant are only exacerbated by pollution from the neighboring Four Corners Power

_____

[2] http://www.pnm.com/systems/sj.htm (last visited on October 14, 2011).
[3] http://camddataandmaps.epa.gov/gdm/index.cfm?fuseaction=emissions.wizard (last visited on Oct. 14, 2011).

Plant, which, according to EPA, is the largest single source of NOx

emissions in the entire country.[4]

## B.    Impacts to National Parks and to the Ecosystem

San Juan's pollution adversely impacts visibility in our nation's

national parks and wilderness areas.  EPA has identified 16 such

pristine or "Class I" areas that are affected by San Juan's pollution

load.  These are:  Arches National Park (UT); Bandelier Wilderness

(NM); Black Canyon of the Gunnison Wilderness (CO); Canyonlands

National Park (UT); Capitol Reef National Park (UT); Grand Canyon

National Park (AZ); Great Sand Dunes National Monument (CO); La

Garita Wilderness (CO); Maroon Bells Snowmass Wilderness (CO);

Mesa Verde National Park (CO); Pecos Wilderness (NM); Petrified

Forest National Park (AZ); San Pedro Parks Wilderness (NM); West Elk

Wilderness (CO); Weminuche Wilderness (CO); and Wheeler Peak

Wilderness (NM).  76 Fed. Reg. at 501, Table 6.  This haze impedes the

---

[4] http://www.epa.gov/region9/air/navajo/ (last visited on Oct. 13, 2011).

6

Environmental Coalition's members' enjoyment of these iconic landscapes. *See, e.g.,* Declaration of Kevin Dahl ("Dahl Decl."), attached as Exhibit B at 1: ¶2.

These same emissions have also been linked to a variety of other harms in national parks and the ecosystem. For example, nitrogen oxides combine with other pollutants and sunlight to create ground level ozone, also known as smog. *See* Dahl Decl. (Exhibit B) at p. 3. Ozone makes sensitive plants more susceptible to diseases and damage, inhibits plant growth and crop yields, and threatens biodiversity. *Id*. According to EPA, in the United States alone, ozone damage is responsible for approximately $500 million in reduced crop production each year. *Id*.

Sulfur dioxide and nitrogen oxide emissions also create acid rain and nitrogen deposition that damages not only sensitive ecosystems, but, also historical structures and monuments in national parks. *Id*. Acid rain is likewise responsible for weakening and killing plants and fish. *Id*.

## C.   Public Health Impacts

A well-established and growing body of scientific evidence links short-term exposures to nitrogen oxides ("NOx") with adverse respiratory effects.  These effects include airway inflammation in healthy people and increased respiratory symptoms in people with asthma.[5]  There is also a documented connection between breathing during periods of elevated short-term $NO_2$ concentrations and increased visits to emergency departments and hospital admissions for respiratory issues, especially asthma.[6]

Health-related impacts from human exposure to $SO_2$ are also well documented and include a range of respiratory impacts such as bronchoconstriction and increased asthma symptoms.[7]  Furthermore, when $SO_2$ is released into the air, some portion of it eventually becomes sulfur trioxide ($SO_3$), which, in turn, reacts with moisture in the air to

---

[5] http://www.epa.gov/air/nitrogenoxides/health.html (last visited Oct. 14, 2011).

[6] *Id.*

[7] http://www.epa.gov/air/sulfurdioxide/health.html (last visited Oct. 14, 2011).

8

form sulfuric acid (more commonly known as battery acid).  According

to the Agency for Toxic Substances and Disease Registry ("ATSDR"),

"sulfuric acid and other acids are very corrosive and irritating and

cause direct local effects on the skin, eyes, and respiratory and

gastrointestinal tracts when there is direct exposure to sufficient

concentrations."[8]  And, according to the International Agency for

Research on Cancer ("IARC"), "[o]ccupational exposure to strong-

inorganic-acid mists containing sulfuric acid is carcinogenic to

humans."[9]

## IV.   ARGUMENT

### A.   Legal Standard

An aspiring intervenor must state its interest in the case and

explain why the existing parties cannot adequately represent those

interests.  Fed. R. App. P. 15(d); Local Rule 15.2(B)(1).  As this Court

---

[8] http://www.atsdr.cdc.gov/phs/phs.asp?id=254&tid=47 (last visited on
Oct. 14, 2011).

[9] http://monographs.iarc.fr/ENG/Monographs/vol54/volume54.pdf (last
visited on October 6, 2011).

has made clear, "[t]he central concern in deciding whether intervention is proper is the practical effect of the litigation on the applicant for intervention." *San Juan County v. United States*, 503 F.3d 1163, 1193 (10th Cir. 2007); *see also Utah Ass'n of Counties v. Clinton*, 255 F.3d 1246, 1249 (10th Cir.2001) (explaining that this Court "follows a somewhat liberal line in allowing intervention").

In short, "[i]f an absentee would be substantially affected in a practical sense by the determination made in an action, he should, as a general rule, be entitled to intervene." *San Juan County*, 503 F.3d at 1195 (internal quotation marks omitted).  As explained below, the Environmental Coalition satisfies these requirements because it has local aesthetic, recreational, public health and economic interests that are not adequately represented by EPA.

### B.    The Environmental Coalition Represents Local Interests

Under Rule 15(d), a motion to intervene in a petition for review must be filed within 30 days of the filing of the petition,[10] and must contain a "concise statement of the interest of the moving party and the grounds for intervention."  Fed. R. App. P. 15(d).

The Environmental Coalition's interest in this matter is to ensure that the FIP's BART determination for San Juan not only protects its interest in improving visibility in nearby parks and wilderness areas, but also serves its members' local aesthetic, recreational and economic interests as well as their local public health and environmental justice interests.  The local nature of the Environmental Coalition's interests is demonstrated by the attached declarations and is described below.  *See* Declaration of Anna M. Frazier on behalf of Diné CARE ("Frazier Decl."), attached as Exhibit A; Dahl Decl. on behalf of NPCA, attached

---

[10] PNM filed its petition for review on September 16, 2011.  Appellate Case: 11-9557, Document No. 01018714287.  Because the thirtieth day after this date (October 16, 2011) falls on a Sunday, the filing period runs until the next day.  Fed. R. App. Proc. 26(a)(1)(C).  This motion is therefore timely.

as Exhibit B; Declaration of Mariel Nanasi on behalf of NEE ("Nanasi

Decl."), attached as Exhibit C; Declaration of Mike Eisenfeld on behalf

of SJCA ("Eisenfeld Decl."), attached as Exhibit D; Declaration of David

Van Winkle on behalf of Sierra Club ("Van Winkle Decl."), attached as

Exhibit E.

### C. EPA Cannot Adequately Represent the Interests of the Environmental Coalition

Local Rule 15.2(B)(1) states that in addition to the requirements

of Fed. R. App. Proc. 15(d), "a nonparty motion must state the reasons

why the parties cannot adequately protect the interest asserted." As

this Court has found, the government is ill-positioned to represent the

particular, localized interests of an aspiring intervenor. *Utah Ass'n of

Counties*, 255 F.3d at 1254 (An intervenor's "showing is easily made

when the party upon which the intervenor must rely is the government,

whose obligation is to represent not only the interest of the intervenor

but the public interest generally, and who may not view that interest as

coextensive with the intervenor's particular interest."). This is because

"[i]n litigating on behalf of the general public, the government is

obligated to consider a broad spectrum of views, many of which may conflict with the particular interest of the would-be intervenor." *Id*. at 1256.

This case is no exception. If denied party status, the Environmental Coalition would be forced to rely on EPA to represent their interests in this case. However, EPA does not represent the Environmental Coalition's particular, localized interests. Unlike EPA, whose interest is to preserve its discretion and authority, the Environmental Coalition's interests are grounded in deeply personal, localized visibility and public health concerns, as well as concerns that the true costs of coal combustion San Juan are being externalized onto the broader public, including the Environmental Coalition and its members. *See* Exhibits A-E.

Each of the Environmental Coalition's organizations has members who live within the region. They and their families are directly and adversely impacted by pollution from San Juan. *See* Nanasi Decl. (Exhibit C); Eisenfeld Decl. (Exhibit D); Frazier Decl. (Exhibit A). The Environmental Coalition's declarants also have an interest in

13

minimizing the local economic impacts of pollution from San Juan. *See*
Van Winkle Decl. (Exhibit E); Dahl Decl. (Exhibit B); Frazier Decl.
(Exhibit A). Strong pollution controls are needed to support tourism in
the region's world-class outdoor recreational areas, including the 16
Class I areas affected by San Juan. For example, as explained by Mr.
Eisenfeld, in 2008, national parks supported more than 18,000 local
jobs and saw more than 8 million recreational visits. Eisenfeld Decl.
(Exhibit D) at p. 3. In that same year, park visitors and staff
contributed more than $721 million to local economies. *Id.* The local
economic benefit of EPA's action also includes job creation resulting
from installation of the modern pollution controls representing BART.

Given the location of San Juan, its proximity to other large
sources of pollution, and the resulting disproportionate impact on
residents of the nearby Navajo Nation, these local public health and
economic impacts also raise undeniable environmental justice

14

interests[11] that the Environmental Coalition seeks to vindicate.  *See*

Frazier Decl. (Exhibit A) at p. 1.  Faithful implementation of the Act's

visibility mandate in Class I areas offers the co-benefit of helping EPA

achieve its stated goal of "provid[ing] an environment where all people

enjoy the same degree of protection from environmental and health

hazards and equal access to the decision-making process to maintain a

healthy environment in which to live, learn, and work."[12]  EPA's action

also forces San Juan to internalize some of its externalized public

health costs (estimated to be $255 million per year)[13] and

environmental costs, which levels the playing field for renewable power

generation, such as solar and wind power – a key interest of the

Environmental Coalition. *See, e.g.,* Nanasi Decl. (Exhibit C) at p. 6: ¶11.

---

[11] "Environmental Justice is the fair treatment and meaningful
involvement of all people regardless of race, color, national origin, or
income with respect to the development, implementation, and
enforcement of environmental laws, regulations, and policies."  *See*
http://www.epa.gov/environmentaljustice/basics/index.html (last visited
on Oct. 14, 2011)
[12] *Id.*
[13] See Van Winkle Decl. (Exhibit E) at p. 3.

the outcome of this proceeding also potentially affects EPA's BART

determination for the nearby Four Corners Power Plant, a plant that

similarly impacts the Environmental Coalition's interests.

The Environmental Coalition's interests are often at odds with

those of EPA. Members of the Environmental Coalition have frequently

disagreed with – and challenged in rulemaking comments and court

proceedings – EPA's actions and inaction under the Clean Air Act. *See,

e.g.*, *Arizona Pub. Serv. Co. v. U.S. E.P.A.*, 562 F.3d 1116 (10th Cir.

2009) (San Juan Citizens Alliance and Sierra Club challenge of a FIP

for the Four Corners Power Plant); *Sierra Club v. EPA*, 551 F.3d 1019

(D.C. Cir. 2008) (Sierra Club challenge of permitting exemptions for

hazardous air pollution sources); *Natural Resources Defense Council v.

EPA*, 489 F.3d 1364 (D.C. Cir. 2007) (Sierra Club challenge of

hazardous air pollutant standards for plywood manufacturers); *Natural

Resources Defense Council v. EPA*, 489 F.3d 1250 (D.C. Cir. 2007)

(Sierra Club challenge of EPA air pollution standards for industrial

boilers). Even here, the parties' legal interests diverge. For example, in

16

response to PNM's arguments, EPA may assert that its BART

determination for San Juan resulted from the proper exercise of its

discretion.  *See* PNM's Docketing Statement (filed September 29, 2011)

at pp. 5-6.  The Environmental Coalition, by contrast, will argue that

the San Juan BART determination represents the minimal standard of

protection required by the Act and that EPA had discretion to issue far

more protective pollution limits.  Thus, although EPA and the

Environmental Coalition may share the same basic objective – defense

of EPA's FIP – the arguments that EPA and the Environmental

Coalition will raise may very well be different.

In short, the Environmental Coalition cannot rely on EPA to

present the full range of legitimate arguments available to oppose

weakening of its BART determination for San Juan and, at the very

least, to ensure that the Environmental Coalition's interests are fully

represented in any mediation, settlement, or remedy proceedings that

may occur.  The Environmental Coalition more than meets its

"minimal" burden to show inadequate representation.  *Utah Ass'n of*

*Counties*, 255 F.3d at 1253.  "[A]n intervenor need only show the

*possibility* of inadequate representation." *WildEarth Guardians v. U.S. Forest Serv.*, 573 F.3d 992, 996 (10th Cir. 2009) (citation omitted) (emphasis in original).

The Environmental Coalition respectfully submits that the Court's adjudication will therefore be assisted by hearing from leading non-governmental advocates – and beneficiaries – of the Clean Air Act's public health and environmental protections.

## V.    CONCLUSION

As explained above, the Environmental Coalition has met the requirements for intervention: Each group has an interest relating to the subject matter of this action that may be impaired by disposition in its absence, and that interest is not adequately represented by the existing parties.  See Fed. R. App. P. 15(d); Local Rule 15.2(B)(1).  On this basis, the Environmental Coalition respectfully requests intervention.

Respectfully submitted October 17, 2011.


                                        s/ Suma Peesapati
                                        Suma Peesapati (CA Bar #203701)
                                        Earthjustice
                                        426 17th Street, 5th Floor
                                        Oakland, CA 94612
                                        (510) 550-6725 (tel)
                                        (510) 550-6749 (fax)
                                        speesapati@earthjustice.org

                                        Erik Schlenker-Goodrich (NM Bar #17875)
                                        Western Environmental Law Center
                                        208 Paseo del Pueblo Sur, #602
                                        Taos, New Mexico 87571
                                        (575) 613-4197 (tel)
                                        (575) 751-1775 (fax)
                                        eriksg@westernlaw.org

                                        Attorneys for Applicants in Intervention
                                        Diné CARE *et al.*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Civil Procedure 7.1, Diné Citizens Against Ruining Our Environment, National Parks Conservation Association, New Energy Economy, San Juan Citizens Alliance and Sierra Club all state that they have no parent corporations or entities. Because none of these organizations are publicly-traded corporations or entities that have issued stock, no publicly held corporation or entity owns ten percent of more of any of the organizations' stock.

s/ Suma Peesapati
Suma Peesapati

## CERTIFICATE OF DIGITAL SUBMISSION
## AND PRIVACY REDACTIONS

The undersigned certifies that:

(1) All required privacy redactions have been made; and

(2) This digital submission was scanned for viruses with Symantec

Endpoint Protection v11.0.6005.562, which was last updated on October

17, 2011. According to this program, this submission is free of viruses.

s/ Suma Peesapati
Suma Peesapati


## CERTIFICATE OF SERVICE

I hereby certify that on this 17th day of October, 2011, a copy of

this Unopposed Motion to Intervene by Diné Citizens Against Ruining

Our Environment, National Parks Conservation Association, New

Energy Economy, San Juan Citizens Alliance and Sierra Club was

served electronically on all parties to this matter, through the Court's

CM/ECF system.

s/ Suma Peesapati
Suma Peesapati

21

Exhibit A

Case No. 11-9557

IN THE UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT

| | |
|---|---|
| PUBLIC SERVICE COMPANY OF NEW MEXICO, | \| |
| | \| |
| Petitioner, | \| |
| | \| |
| v. | \| |
| | \| |
| UNITED STATES ENVIRONMENTAL PROTECTION AGENCY and Lisa Jackson, Administrator, UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, | \| |
| | \| |
| Respondents. | \| |

An Original Action in the Court of Appeals, challenging
a Federal Rule found at 76 Fed. Reg. 52,388 (Aug. 22, 2011)

**DECLARATION OF ANNA M. FRAZIER**

# DECLARATION OF ANNA FRAZIER

1.      My name is Anna Frazier. I am more than 18 years of age and a resident of Winslow, Arizona.

2.      My work address is HC-63, Box 6113, Winslow, AZ 86047.

3.      I am a member and Staff of Diné CARE, a prospective intervenor in this matter.

4.      Diné CARE is an indigenous environmental organization committed to protect and preserve the Diné (Navajo) way of life.

5.      Diné CARE has offices in Dilkon, AZ (within Navajo Nation land with postal service in Winslow, Arizona) and Durango, Colorado.

6.      One of Diné CARE's projects is to minimize the environmental impacts of coal-fired power generation in the Colorado Plateau.

7.      Diné CARE regularly works on air quality issues related to the San Juan Generating Station ("SJGS").  More specifically, Diné CARE has been working for years on reducing air pollution from the SJGS, which has adverse impacts on indigenous people living on the Navajo tribal lands.  The SJGS is located only approximately 6 miles from Navajo tribal lands.

8.      On April 4, 2011 Diné CARE submitted written comments to the U.S. Environmental Protection Agency ("EPA") regarding its proposed regional haze

**DECLARATION OF ANNA FRAZIER**               **Page 1 of 4**

federal implementation plan for the SJGS, which is the subject of the Petition for
Review in this matter.

9.      According to the EPA and National Park Service, air pollution from
the SJGS causes visibility impairment in the Four Corners area, where I live, work,
and travel.  I regularly travel near and through the national parks in the Four
Corners area of New Mexico, Arizona, and Colorado. One of the reasons I travel
through these parks is to visit family members who reside in the vicinity of the
unique natural vistas.  The natural vistas in the national parks I travel through in
the Four Corners area are adversely impacted by air pollution from the SJGS.
Pollution from the SJGS reduces my enjoyment when visiting family in and near
these national parks.  I am also less likely to travel to one of these national parks to
visit on a "bad" visibility day.  SJGS also impairs visibility on Navajo tribal lands
and regionally throughout the Four Corners area.  The regional haze caused by the
SJGS lessens my enjoyment of living in the Four Corners area due to the health
impacts on myself and family.  These national parks sites are culturally and
religiously significant to Navajos and the impaired visibility is a desecration of our
rights to practice our beliefs as an indigenous U.S. citizens.

10.     This same SJGS air pollution also has detrimental health impacts. One
of the pollutants addressed by EPA's federal implementation plan for the SJGS is

**DECLARATION OF ANNA FRAZIER**                              **Page 2 of 4**

oxides of nitrogen.  Oxides of nitrogen cause visibility impairment and also contribute to smog and ground level ozone.  EPA's regional haze federal implementation plan for the San Juan Generating Station requires the coal plant to reduce emission of oxides of nitrogen to .05 lbs/million BTU.  Public Service Company of New Mexico ("PNM"), the owner and operator of SJGS, has publicly opposed EPA's emission limit.  Instead, PNM has proposed allowing it to emit over four times the concentration of oxides of nitrogen that have been proposed by EPA.

11.     I am concerned that the Petition for Review seeks to overturn the visibility and health benefits that will result from the EPA's regional haze federal implementation plan.  I am concerned that if PNM's Petition for Review is successful, my health will be adversely impacted from breathing air pollution from the SJGS in areas that I live, work, and travel.  I am also concerned that PNM's Petition for Review will prevent EPA's attempt to eliminate regional haze that currently impedes my ability to enjoy the natural vistas in national parks that I travel to in the Colorado Plateau, such as Grand Canyon National Park and Mesa Verde National Park.

12.     My interests are not protected by the involvement of EPA in this Petition for Review.  First, there are no EPA Regional Offices in the Four Corners

**DECLARATION OF ANNA FRAZIER**                              **Page 3 of 4**

area. Therefore, none of the EPA employees working on this case are forced to breathe the polluted air from the SJGS. Additionally, Diné CARE's written comments to EPA requested that the agency impose stricter air emission requirements on the SJGS than were adopted by the agency. The EPA rejected Diné CARE's proposed emission limits for the SJGS. Therefore, Diné CARE's will not be adequately represented in this litigation by the EPA. By intervening, Diné CARE intends to inform this Court that the regional haze requirements supported imposing even stricter air emissions limits on the SJGS than were adopted by the EPA.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge. 28 U.S.C. § 1746.

Dated this _15_ day of _October_, 2011.

Anna M. Frazier

**DECLARATION OF ANNA FRAZIER**               **Page 4 of 4**

# EXHIBIT B

Case No. 11-9557

IN THE UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT

| | |
|---|---|
| PUBLIC SERVICE COMPANY OF NEW MEXICO, | \| |
| | \| |
| Petitioner, | \| |
| | \| |
| v. | \| |
| | \| |
| UNITED STATES ENVIRONMENTAL PROTECTION AGENCY and Lisa Jackson, Administrator, UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, | \| |
| | \| |
| Respondents. | \| |

An Original Action in the Court of Appeals, challenging
a Federal Rule found at 76 Fed. Reg. 52,388 (Aug. 22, 2011)

**DECLARATION OF KEVIN DAHL**

## DECLARATION OF KEVIN DAHL

1.      My name is Kevin Dahl. I am more than 18 years of age and a citizen of the United States. I reside in Tucson, Arizona.

2.      I work for National Parks Conservation Association ("NPCA") as the organization's Arizona Program Manager and member of the Southwest Regional Team. In that capacity, I help oversee full and fair implementation of the Clean Air Act to ensure that the pollution from coal-fired power plants does not harm our country's iconic national parks in the Four Corners Region. San Juan impacts air quality at 16 Class I areas, including eight Class I national parks. I have visited most of those parks, and plan on visiting the others, and would like to expect that these special places will have healthy air and unobstructed vistas. I have seen power-plant produced haze obstruct my scenic viewing at Grand Canyon National Park, which affected my experience at the park. I would therefore like to see the pollution from coal-fired power plants stop harming our national parks.

3.      NPCA is a nonpartisan, nonprofit, conservation organization dedicated to protecting and enhancing America's National Park System for present and future generations. NPCA was established in 1919 and today has approximately 325,000 members around the United States, including 3,162 in New Mexico, 7,967 in Arizona, 8,703 in Colorado, and 2,239 in Utah, who care deeply

**DECLARATION OF KEVIN DAHL**                                    **Page 1 of 5**

about the well-being of the nation's national parks. One of NPCA's priorities is to protect our national parks from the damaging impacts of air pollution.

4.      NPCA seeks to defend the Environmental Protection Agency's Federal Implementation Plan ("FIP") for the San Juan Generating Station ("SJGS") in New Mexico. Amongst other things, EPA's decision will require SJGS to comply with a Best Available Retrofit Technology ("BART") decision. That BART decision will require SJGS to meet a fairly strong standard for nitrogen oxide ("NOx") emissions of 0.05 lbs/million BTU through installation of Selective Catalytic Reduction technology.

5.      Regional haze results from small particles in the atmosphere that impair a viewer's ability to see long distances, color, and geologic formations. While some haze-causing particles result from natural processes, most result from anthropogenic sources of pollution. Haze-forming pollutants, including nitrogen oxides (NOx), contribute directly to haze or form haze after breaking down in the atmosphere. According to the Park Service, "white light will tend to look reddish or brownish in color after passing through a nitrogen dioxide haze." (Malm, "Introduction to Visibility," 1999, p. 10.)   These air pollutants contribute to the deterioration of air quality and reduced visibility in our national parks and wilderness areas. Visibility impairment is measured in deciviews, which is a

**DECLARATION OF KEVIN DAHL**                    **Page 2 of 5**

measure of the perceptible change in visibility. The higher a deciview value, the worse the visibility impairment.  The baseline impact of SJGS is 33.18 deciviews across 16 Class I areas which include 8 National Parks. With the installation and operation of SCR (limit of 0.05lb/mmBtu), visibility will be improved by 21.69dv, producing visibility conditions of 11.48dv once the unit is operating at the limit.

6.      Controlling NOx pollution is critical for other reasons, as well. NOx are linked to harms suffered by national parks, the natural and cultural resources they protect, and those parks' staff and visitors. NOx combine with other pollutants and sunlight to create ground-level ozone, or smog. Ozone, in turn, can impact render sensitive plants more vulnerable to disease and other impacts, inhibit plant growth and crop yields, and, in so doing, impair biodiversity. According to EPA, in the United States alone, ozone damage is responsible for approximately $500 million in reduced crop production each year; its impact to natural flora is undoubtedly similar.

7.      NOx, as well as another air pollutant, sulfur dioxide, can also create acid rain and nitrogen deposition that damages not only sensitive ecosystems, but, also, historical structures and monuments in national parks. Acid rain is likewise responsible for weakening and killing plants and fish.

**DECLARATION OF KEVIN DAHL**                         **Page 3 of 5**

8.    NPCA very much appreciates EPA's work to control regional haze pollution from SJGS. However, EPA does not represent NPCA's interests in the long-term protection of our National Parks being limited in scope to those areas set forth in law and regulation. The National Park System, often touted as "America's Best Idea," deserves an advocate that solely speaks for its interests; for more than 90 years NPCA has filled that role.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge. 28 U.S.C. § 1746.

Dated this 14th day of October , 2011.

Kevin Dahl

**DECLARATION OF KEVIN DAHL**                     **Page 4 of 5**

EXHIBIT C

Case No. 11-9557

IN THE UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT

PUBLIC SERVICE COMPANY OF                    |
NEW MEXICO,                                  |
                                             |
     Petitioner,                                  |
                                             |
v.                                           |
                                             |
UNITED STATES ENVIRONMENTAL                  |
PROTECTION AGENCY and Lisa Jackson,          |
Administrator, UNITED STATES                 |
ENVIRONMENTAL PROTECTION                     |
AGENCY,                                      |
                                             |
     Respondents.                                 |

An Original Action in the Court of Appeals, challenging
a Federal Rule found at 76 Fed. Reg. 52,388 (Aug. 22, 2011)

## DECLARATION OF MARIEL NANASI

## DECLARATION OF MARIEL NANASI

1.      My name is Mariel Nanasi. I am an attorney and the Executive

Director of New Energy Economy. New Energy Economy is a Santa Fe based non-

profit organization dedicated to creating economic opportunities for New Mexicans

while providing solutions to global warming.

2.      I am a member of New Energy Economy and a retail customer of

Public Service Company of New Mexico (hereafter "PNM").

3.      New Energy Economy is a business customer of PNM and represents

over 10,500 New Mexico members and supporters who are, in large part,

residential customers of PNM. New Energy Economy specifically seeks to

represent their interests in the appeal of this rule and address their vital health,

economic, social welfare and environmental concerns.

4.      On August 5, 2011, the Environmental Protection Agency (hereafter

"EPA") issued a final rule mandating that the San Juan coal plant impose strong

pollution controls called Selective Catalytic Reduction, (hereafter "SCR") to

reduce nitrogen oxides (hereafter "NOx"). The final rule also requires the plant to

reduce other harmful emissions. Hundreds of our activists contributed to this

outcome by testifying at EPA hearings, writing articles, op-eds and letters to the

editor, and submitting public comments to the EPA urging it to reduce the

**DECLARATION OF MARIEL NANASI**                **Page 1 of 12**

pollution coming from the San Juan coal plant.

5.     Along with the New Mexico Environmental Law Center, I represented New Energy Economy, on behalf of our members, in the successful adoption of a carbon pollution reduction rule[1] by New Mexico's Environmental Improvement Board (hereafter "EIB"). On December 6, 2010, after a two-year rulemaking process, which included over two hundred hours of scientific, economic, health and public testimony, the EIB adopted New Energy Economy's Rule, to reduce greenhouse gas ("GHG") emissions by 3 percent per year from 2010 levels; the regulation would take effect in 2013[2]. This rule enables effective and procedurally efficient carbon pollution reduction that is legally durable and lays a crucial policy foundation for clean energy job creation, related economic growth and energy security.

6.     Coal-burning power plants are the nation's largest source of carbon dioxide, the heat-trapping GHG pollutant that causes global warming. PNM is responsible for more than half of all carbon emissions in New Mexico. PNM's SJGS also causes local pollution that has alarming health risks. SJGS plant emits

---

[1] NMAC Part 20.1.100

[2] PNM has appealed Rule 100; *Public Service Company of New Mexico vs. New Mexico Environmental Improvement Board*, Case No. 31,200.

**DECLARATION OF MARIEL NANASI**                    **Page 2 of 12**

pollution that is associated to increased asthma attacks[3] and to environmental

problems like acid rain, haze, smog, and other air and water pollution. These air

quality impacts have, to date, escaped adequate regulation and have high

associated costs[4]. These are *externalized* costs – i.e., costs that are not paid by

---

[3] Volumes of harmful emissions can be swept vast distances, and create more photochemical smog and higher concentrations of CO2-linked aeroallergens (pollen and mold) that drive up rates of asthma, which already afflicts one in four high school children in New Mexico. http://healthyamericans.org/states/?stateid=NM#section=1,year=2010,code=undefined (last visited Oct. 10. 2011).

[4] Associated health and environmental costs are sure to hit all New Mexico families unless rapid change takes place to curb emissions and pollution in our state.  According to a report by The Program on Climate Economics, Climate Leadership Initiative (CLI), Institute for a Sustainable Environment, University of Oregon in conjunction with the University of New Mexico, entitled: "An Overview of Potential Economic Costs to New Mexico of a Business-As-Usual Approach to Climate Change" illustrates some of the potential costs New Mexico's families, businesses, and communities might incur over the next several decades if New Mexico were to continue a business-as-usual approach to climate change. New Mexicans would incur costs as they engage in practices that contribute to climate change, such as consuming electricity generated by burning coal and continuing with technologies and practices that waste energy. By 2020, these costs total $3.2 billion per year. If spread evenly, New Mexico's households, on average, could incur annual costs of $3,430 per year by 2020. The major costs are potential increases in wild fire costs, with a value of $490 million per year, and potential health-related costs of about $421 million per year. In addition, continuing with the status quo would cost New Mexicans almost $1.3 billion per year in missed opportunities to implement energy-efficiency programs and about $275 million per year in health costs from burning coal. The combined total annual costs increase with time, to almost six-fold by 2080. "An Overview of Potential Economic Costs to New Mexico of a Business-As-Usual Approach to Climate Change," February 2009, http://ccsl.iccip.net/climate_economics_impacts_report.pdf (last visited

**DECLARATION OF MARIEL NANASI**          **Page 3 of 12**

PNM Resources or its customers but, rather, by people suffering from these impacts.

7.    Given the fact that PNM's SJGS is approximately forty years old, requiring badly needed maintenance infrastructure and lacking in necessary environmental controls, NEE believes that recent heightened interest in energy efficiency, new generation methodology, evolving renewable resources, state-of-the-art pollution controls, and innovative approaches to environmental remediation could all eventually significantly change power market dynamics as we view them today.

8.    PNM has underestimated the ability of SCR to reduce harmful emissions and has even claimed that SCR pollution control technology is not cost-effective. Contrary to PNM's contentions, not only is SCR technology a more cost-effective pollution control measure, ton-for-ton, than Selective Non-Catalytic Reduction (hereafter "SNCR") (<$2,000/ton NOx reduction via SCR versus <$3,700/ton NOx reduction via SNCR), but it is also a far more effective pollution control measure (the removal of 17,501 tons of NOx/year via SCR versus 4,900 tons of NOx/year via SNCR), and is premised on a more robust BART

October 10, 2011).

**DECLARATION OF MARIEL NANASI**                    **Page 4 of 12**

determination (0.05lbs/MMBtu versus 0.23 lbs/MMBtu). Further, PNM has

misstated the cost of compliance with EPA's ruling (using SCR technology) and

has been caught in repeated misstatements by New Energy Economy[5]. Moreover, it

must be understood that PNM's cost estimates do not account for the costs of its

pollution to the people of the region in the form of health impacts, associated

increases in health care costs, and environmental degradation.

9.    New Energy Economy's organizational purpose is to provide

solutions to climate change. We address the economic, environmental and human

health impacts of climate change in our community while advocating policy

changes that will increase access to renewable energy technologies and create jobs.

This purpose is designed to protect our members' interests.

10.    The research, development, and production of clean, renewable, and

diverse energy resources is of paramount importance and will affect the health and

welfare and economic well-being of New Mexicans. Conversely, the continued

reliance on fossil fuel technologies that have caused global warming is having and

will continue to have negative economic, social, and health consequences on our

---

[5] See, http://www.santafenewmexican.com/LocalColumnsViewpoints/My-View--Mariel-Nanasi-Coal-fired-plant-s-stats-were-greatly-mi, *The New Mexican*, September 25, 2011 (last visited October 10, 2011).

**DECLARATION OF MARIEL NANASI**          **Page 5 of 12**

community.

11.     The San Juan plant is one of America's largest single sources of
nitrogen oxides (NOx) and sulfur dioxide (SO2) emissions, emits more than 8.5
million tons per year of carbon emissions, and consumes more than 9.3 billion
gallons of clean water per year. Coal has multiple health, environmental and
economic impacts that carry high societal costs. Requiring PNM to address and
pay for some of the heretofore "externalized" true costs (health care costs,
depreciated property values, polluted water ways, etc.) levels the playing field for
renewables. When public health care costs of burning coal are taken into account
and compared to other forms of electricity generation, a 2011 study by Harvard
Medical School's Center for Health and the Global Environment found that burning
coal was overwhelmingly more expensive than renewables and hydro-power.[6]

12.     New Energy Economy seeks to intervene in this case because of our
concern for the human, environmental and long-term economic impacts caused by

---

[6] Full cost accounting for the life cycle of coal. Paul R. Epstein, Jonathan J.
Buonocore, Kevin Eckerle, Michael Hendryx, Benjamin M. Stout III, Richard
Heinberg, Richard W. Clapp, Beverly May, Nancy L. Reinhart, Melissa M. Ahern,
Samir K. Doshi, and Leslie Glustrom. 2011. Full cost accounting for the life cycle
of coal in "Ecological Economics Reviews." Robert Costanza, Karin Limburg &
Ida Kubiszewski, Eds. *Ann. N.Y. Acad. Sci.* 1219: 73–98.

**DECLARATION OF MARIEL NANASI**                    **Page 6 of 12**

pollution from San Juan Generating Station. The effects of SJGS's pollution on physical and biological systems have occurred, especially, in New Mexico and in Colorado, Utah, and Arizona for at least four decades. While we support EPA's ruling to limit NOx emissions from PNM's San Juan coal-burning facility, we do so for additional reasons to those identified by EPA (effectuating the Clean Air Act's aesthetic and visibility mandate at 16 of our most treasured national parks including the Grand Canyon, Mesa Verde and Bandelier National Monument).

13.   New Energy Economy's position is that air pollution caused by SJGS must be regulated and should be set at levels consistent with what science tells us is necessary to protect human health and the environment. Put differently, we have far broader interests in controlling a broader range of pollution from SJGS than EPA does in this litigation. Extensive research shows that New Mexico and other western states already have experienced noticeable changes in climate and predict that more dramatic effects will occur in the future. Much of these negative effects are readily recognized: warmer stream temperatures during summer stressing fish populations, a change in the natural hydrograph resulting in pre-irrigation (early spring) snow melt (dramatically reducing the state's freshwater supplies), prolonged drought destroying farmers' crops, population declines in sensitive

---

**DECLARATION OF MARIEL NANASI**          **Page 7 of 12**

species, and rapidly growing insect populations attacking trees and causing the

destruction of forests (setting the stage for more wildfires that cause injury,

respiratory disease and death). Establishing science-based levels to account for

these negative impacts should ensure that the otherwise externalized costs of

pollution are paid by SJGS and not by the people who suffer from SJGS's

pollution. If the polluter is made to account for these costs, we will make better

reasoned and more informed decisions regarding energy generation, decisions that

New Energy Economy contends will support our necessary transition away from

coal-fired power and towards the responsible and efficient use of clean energy.

    14.    Hotter temperatures in New Mexico, Arizona, Colorado, Wyoming,

and Utah have and will continue to increase the frequency of record-breaking

wildfires[7] brought on by the current Southwestern drought of epic proportions —

damaging businesses, extinguishing millions of acres of forests and destroying

homes. Energy use will increase costs to keep buildings cool. The impacts on

natural systems can directly and indirectly affect agricultural production.

Productivity of livestock will be reduced. Agricultural diseases and extreme events

that hamper food production (increases in pests that harm important crops) affect

---

[7] http://www.nytimes.com/2011/10/01/science/earth/01forest.html?_r=1 (last
visited October 10, 2011)

**DECLARATION OF MARIEL NANASI**                    **Page 8 of 12**

nutrition and human health. This will cause a multiplier effect, as the cost of food will rise in dramatic proportion to a decrease in food production.

15.    Mountain pine bark beetle infestation has brought devastation throughout the forests of the Southwest in recent years. In the face of a changing climate[8], especially in the high mountain forests of the Sierra, Rocky, and Cascade mountain ranges, the pine beetle has killed large swaths of Whitebark Pine as warmer winters allow the beetle to survive and multiply, leaving the trees virtually defenseless to attack and effecting entire ecosystems. According to recent reports[9], Colorado and Wyoming have lost 3.5 million acres of mountain forest to the bark beetle, with up to 100,000 trees on average falling *every day*, prompting the U.S. Forest Service to take aggressive action to clear out thousands of dead trees. Some studies indicate that more the 17.5 million acres of forest in the west are now infected. It is clear that climate change is rapidly altering mountain and forest ecosystems.

16.    SJGS is a significant emitter of nitrogen oxides and other harmful air pollutants. New Mexicans are particularly vulnerable to the negative consequences

---

[8] Source: Global Warming is Real (http://s.tt/13dcS) (last visited October 10, 2011)
[9] http://globalwarmingisreal.com/2010/09/15/bark-beetle-outbreaks-will-spread-as-forests-adapt-to-climate-change/ (last visited October 10, 2011)

**DECLARATION OF MARIEL NANASI**                **Page 9 of 12**

of these pollutants to human health, including lung and heart diseases. Our especially vulnerable inhabitants include: infants and children; pregnant women; the elderly; the poor; racial and ethnic minorities; people with disabilities; and people with chronic medical conditions, especially with lung diseases and asthma. It is of utmost importance that SJGS be held accountable for its pollution because the externalized costs to New Mexicans and our neighbors far exceeds the cost of the technology to retrofit its facilities.

17.     As a mother of two and a citizen of New Mexico I am personally concerned for the health and well being of my family. The disastrous effects of climate change and air pollution serve as a direct threat to my family and to our community for generations to come. I support EPA's decision to curb local NOx emissions because it directly addresses my personal concern for the welfare of my family.

18.     Like many New Mexican families and businesses who are and will be affected by San Juan Generating coal plant, EPA's decision is important to New Energy Economy and myself because it substantially limits the amount of NOx, which contributes to local/regional air pollution. As an advocacy group that provides solutions to global warming and fights for cleaner energy, EPA's rule will impact our membership-based organization. New Energy Economy's intervention

**DECLARATION OF MARIEL NANASI**                    **Page 10 of 12**

is consistent with the public interest and concern. But more must be done and EPA's decision, in New Energy Economy's and my own view, is merely a single step amongst many that must be taken to control pollution from coal-fired power plants like SJGS.

19.    In recent polling, Westerners actually reject that supporting economic development or the environment is mutually exclusive. Rather, the majority believes that we can enjoy a protected environment that contributes to our quality of life and a strong economy[10]. New Mexicans have consistently favored conservation and a respect for clear air, clean water and healthy land over "cheap energy," especially when that energy is from risky or dirty sources. A recent poll by the Latino Sustainability Institute[11] reveals, overwhelmingly, that New Mexico Hispanics, a crucial constituency, are deeply concerned about the environment and strongly support efforts to protect and preserve threatened land and water resources. A key finding from the poll includes that Hispanic voters have serious concerns about a wide range of conservation issues, particularly drought and water scarcity, forest fires, and pollution of air and water.

---

[10] http://www.coloradocollege.edu/stateoftherockies/conservationinthewestsurvey_e.html (last visited October 10, 2011)

[11] http://www.google.com/search?q=Latino+Sustainability+Institute+and+Project+

**DECLARATION OF MARIEL NANASI**               **Page 11 of 12**

I declare under the penalty of perjury that the foregoing is true and correct to the best of my knowledge. 28 U.S.C. §1746.

Dated: October 13, 2011

Mariel Nanasi, Esquire

New+America+Latino+Survey&ie=utf-8&oe=utf-8&aq=t&rls=org.mozilla:en-US:official&client=firefox-a (last visited October 10, 2011)

**DECLARATION OF MARIEL NANASI**              **Page 12 of 12**

# EXHIBIT D

Case No. 11-9557

IN THE UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT

| | |
|---|---|
| PUBLIC SERVICE COMPANY OF NEW MEXICO, | \| |
| | \| |
| Petitioner, | \| |
| | \| |
| v. | \| |
| | \| |
| UNITED STATES ENVIRONMENTAL PROTECTION AGENCY and Lisa Jackson, Administrator, UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, | \| |
| | \| |
| Respondents. | \| |

An Original Action in the Court of Appeals, challenging
a Federal Rule found at 76 Fed. Reg. 52,388 (Aug. 22, 2011)

## DECLARATION OF MIKE EISENFELD

## DECLARATION OF MIKE EISENFELD

1.     My name is Mike Eisenfeld.  I am more than 18 years of age and a

citizen of the United States.  I have lived in Farmington, New Mexico since 1996. I

am a member of the San Juan Citizens Alliance (SJCA) and I work as the New

Mexico Energy Coordinator for that organization.

2.     I live, work and recreate in the San Juan Basin, an area heavily relied

upon for energy export, yet an area that also boasts of world-class recreation and

tourism opportunities because of its scenic rivers, canyons, extraordinary

topography and vistas, national parks and public lands.

3.     The Farmington area is often shrouded in regional haze with a brown

cloud emanating from the two coal fired power plants in the region near Shiprock,

New Mexico.  The San Juan Generating Station (SJGS) and Four Corners Power

Plant (FCPP) came on line, respectively, in 1976 and 1963, and are very large

sources of nitrogen oxides (NOx) and other pollutants. In New Mexico, data from

the U.S. Environmental Protection Agency (EPA) Acid Rain Database from 2010

show total NOx emissions from SJGS and the nearby FCPP are approximately

54,000 tons per year (SJGS- 15,745 tpy NOx and FCPP – 38,838 tpy NOx).  I am

concerned that our area has degraded air quality and apparent associated adverse

**DECLARATION OF MIKE EISENFELD**                    **Page 1 of 7**

public health impacts. I am adversely impacted by the direct and cumulative impacts of pollution emitted from SJGS.

4.      I worked as an environmental consultant from 1997-2006 primarily as a National Environmental Policy Act (NEPA) practitioner. I have worked for SJCA from 2006 to present. SJCA is a grassroots organization dedicated to social, economic, and environmental justice in the San Juan Basin. SJCA has 500 members, including approximately 50 members in New Mexico. SJCA organizes San Juan Basin residents to protect our water and air, our public lands, our rural character, and our unique quality of life while embracing the diversity or our region's people, economy, and ecology. Our longstanding efforts to address the impacts of local coal-fired power plants demonstrate SJCA's belief that vast reduction of pollution from SJGS is long overdue.

5.      In my position as New Mexico Energy Coordinator, I work on issues related to coal fired power plants, coal mines, air quality and public lands. I am familiar with the importance natural areas in our region, including Mesa Verde National Park and other Class I areas such as the Weminuche Wilderness. Since the SJGS borders the eastern side of the Navajo Nation, its pollution adversely impacts other important natural areas such as Chaco Canyon, Canyon de Chelly, and Monument Valley.  My work often takes me into the Shiprock, Waterflow, and

**DECLARATION OF MIKE EISENFELD**                          **Page 2 of 7**

Fruitland areas and I will return to these areas for my work in the coming year on a frequent basis. These areas are heavily impacted by air pollution from local coal-fired power plants, including SJGS. I, along with many others in the region, have observed the notorious brown cloud that settles over the Shiprock area on a daily basis. Pollution from SJGS hurts my interests by reducing visual quality in the region, by degrading natural and environmental systems, by threatening economic opportunities (including tourism) in the region, and by threatening public health. I am concerned about health impacts to families, including my own, in the San Juan Basin from SJGS's pollution.

6.     Our region's national parks bring us tremendous economic benefit and are worth every penny to protect. According to information compiled by the National Parks Conservation Association, park units near SJGS in 2008 supported more than 18,000 local jobs in Arizona, Colorado, New Mexico, and Utah, and saw more than 8 million recreation visits. In that same year, park visitors and staff contributed more than $721 million to local economies. The Southwest relies on tourism and natural resources for long-term economic growth and sustainability.

7.     I would like to see PNM commit to their stated position on Environmental Policy and Leadership and apply it to SJGS and the San Juan Basin. PNM's 2009 statement on Environmental Policy and Leadership states that,

**DECLARATION OF MIKE EISENFELD**                    **Page 3 of 7**

PNM Resources will take a proactive role in finding and supporting solutions that create environmental sustainability. We will go beyond compliance to restore the quality of the environment. Public policy, technology and innovative problem solving are required if we are to meet the needs of people today without compromising the ability for future generations to meet their own needs.

PNM Resources will lead by example, demonstrating responsible environmental behavior and supporting public policy that contributes to environmental sustainability.

www.pnm.com/environment/policy_leadership.htm (last visited Oct. 10, 2011)

8.      I don't believe that current pollution levels at SJGS support environmental sustainability or represent a proactive leadership role in restoring the quality of the environment. Thus, I don't believe that SJGS is promoting a sustainable environment for future generations. If PNM seeks to implement real sustainability in the region, it should expand its generation portfolio by exploring renewable energy opportunities that are being neglected.

9.      In my position at SJCA and as a father, I have been involved in the Best Available Retrofit Technology (BART) proceedings for SJGS under the Regional Haze Program of the Clean Air Act. I participated in public hearings for the BART for SJGS with both the State of New Mexico and Environmental Protection Agency in 2010. My primary interest in the BART proceedings is to secure clean air for families – including my own – that live in the region and to

**DECLARATION OF MIKE EISENFELD**                    **Page 4 of 7**

highlight the responsibilities of the owners of SJGS, including the majority owner
Public Service Company of New Mexico (PNM), to comply with the 1999
Regional Haze Program. I believe that the EPA has made a compelling case that
NOx from SJGS need to be controlled using BART. The identified technology to
accomplish this is Selective Catalytic Reduction (SCR) that achieves a NOx limit
of 0.05 lbs/Mmbtu. If PNM and other owners of SJGS invest in pollution controls
that achieve this limit on a sustained basis, this would redress the harm I described
above. Furthermore, this would force the owners of SJGS to internalize their
plant's externalities in a more equitable and fair way. This investment must take
into account the full costs of coal-fired electricity generation, including its
disproportionate impact to the San Juan Basin, where exported electricity has been
contributing to many environmental, visibility and public health concerns for the
past 40 years.

    10.    San Juan Generating Station currently emits nearly 16,000 tons of
NOx into the air each year.  In addition to causing haze, NOx reacts chemically
with volatile organic compounds (VOCs), sunlight and heat to produce ground-
level ozone, an invisible chemical the American Lung Association calls "the most

**DECLARATION OF MIKE EISENFELD**        **Page 5 of 7**

widespread pollutant in the U.S. [and] one of the most dangerous"[1] — causing asthma attacks, respiratory problems, lung damage, and even premature death. The American Lung Association has given San Juan County, where the plant is located, an "F" grade for ozone pollution due to the number of days each year that it exceeds levels of ozone concentrations that the ALA considers unhealthy.[2]

11.    The state of New Mexico and PNM have backed less effective pollution controls called Selective Non Catalytic Reduction (SNCR) that would cut NOx emissions at SJGS by just 20% compared to the 80-90% reduction potentially achieved by SCR. The State of New Mexico has attempted to thwart EPA's BART determinations with the SNCR proposal despite the fact that this proposal contradicts earlier documents from the state identifying SCR as BART. The EPA has now proposed BART for SJGS. This proposal protects my environmental interests by confirming that a NOx limit of 0.05 lbs/Mmbtu is indeed BART and is the minimum needed to control pollution from SJGS. I also believe that EPA has correctly asserted that the State of New Mexico's SNCR proposal does not meet the requirements of the Regional Haze Program.

---

[1] www.stateoftheair.org/2011/health-risks/health-risks-ozone.html (last visited Oct. 10, 2011).
[2] www.stateoftheair.org/2011/states/new-mexico/san-juan-35045.html (last visited Oct. 10, 2011).

**DECLARATION OF MIKE EISENFELD**                    **Page 6 of 7**

12.     While EPA's decision based on regional haze and visibility is a
decision I support, EPA doesn't represent my broader interest to the extent that I
believe is necessary to truly internalize the costs of relying on coal for electricity,
ensure that public health is protected, and adequately identify the toll on our region
from continued coal combustion. EPA often gives too little weight to the public
health and environmental costs of coal-fired power.

I declare under the penalty of perjury that the foregoing is true and correct to
the best of my knowledge. 28 U.S.C. § 1746.

Dated: October 12, 2011

Mike Eisenfeld

Mike Eisenfeld

**DECLARATION OF MIKE EISENFELD**                    **Page 7 of 7**

# EXHIBIT E

---

Case No. 11-9557

IN THE UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT

| | |
|---|---|
| PUBLIC SERVICE COMPANY OF NEW MEXICO, | \| |
| | \| |
| Petitioner, | \| |
| | \| |
| v. | \| |
| | \| |
| UNITED STATES ENVIRONMENTAL PROTECTION AGENCY and Lisa Jackson, Administrator, UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, | \| |
| | \| |
| Respondents. | \| |

---

An Original Action in the Court of Appeals, challenging
a Federal Rule found at 76 Fed. Reg. 52,388 (Aug. 22, 2011)

---

## DECLARATION OF DAVID VAN WINKLE

---

## DECLARATION OF DAVID VAN WINKLE

1.      My name is David Van Winkle. I am more than 18 years of age and am a citizen of the United States. I reside in Santa Fe, New Mexico.

2.      I am a member of the Sierra Club, and Energy Chair for the Sierra Club's Rio Grande Chapter, which includes all of New Mexico.

3.      The Rio Grande Chapter of the Sierra Club seeks to protect air quality, water quality, and public lands in New Mexico. The Sierra Club was a party to a legal action to improve air quality related to the San Juan Generating Station ("SJGS") that culminated in a consent decree of March 10, 2005. This consent decree required the SJGS to implement pollution controls to reduce nitrogen oxide, sulfur dioxide, particulate matter, and mercury by significant amounts. While this consent decree was a step in the right direction, SJGS has additional responsibilities to clean up its pollution. The Sierra Club has also been active in seeking improved New Mexico legislation to increase use of clean energy sources (Renewable Energy Act), such as wind, solar, and geothermal, as well as legislation to improve energy efficiency (Efficient Use of Energy Act). The Sierra Club has also been an active participant in the implementation of these laws via the New Mexico Public Regulation Commission.

4.      According to the American Lung Association, "Nitrogen dioxide is a

**DECLARATION OF DAVID VAN WINKLE**                    **Page 1 of 5**

gaseous air pollutant composed of nitrogen and oxygen. NO2 forms when fossil

fuels such as coal, oil, gasoline or diesel are burned at high temperatures. NO2 also

contributes to the formation of particle pollution and ozone. NO2 converts in the

atmosphere to nitrate aerosols, a prime component of fine particle pollution. Fine

particles are associated with serious health effects ranging from respiratory

problems to premature death. Nitrogen oxides also are a building block of ozone

smog, a major respiratory irritant that also increases the risk of premature death."

http://www.lungusa.org/healthy-air/outdoor/resources/Fact-Sheet-on-Proposal-

ALA-NO2-November-2009.pdf (last visited October 11, 2011).

        5.      The American Lung Association has also explained that, "Nitrogen

dioxide causes a range of harmful effects on the lungs: 1) Increased inflammation

of the airways; 2) Worsened cough and wheezing; 3) Reduced lung function; 4)

Increased asthma attacks; 5) Greater likelihood of emergency department and

hospital admissions; 6) Increased susceptibility to respiratory infection, such as

influenza." http://www.lungusa.org/healthy-air/outdoor/resources/Fact-Sheet-on-

Proposal-ALA-NO2-November-2009.pdf (last visited October 11, 2011).

        6.      The SJGS is located near Farmington, New Mexico and dumped

about 16,000 tons of nitrogen oxides ("NOx") into the air in 2010. That outsized

negative impact on our air is why requiring old coal plants, like SJGS, to install

**DECLARATION OF DAVID VAN WINKLE               Page 2 of 5**

overdue pollution controls is so important.

6.      The harm done to human health by SJGS coal pollutants carries heavy financial costs. Asthma attacks, heart attacks, premature deaths and hospital visits from San Juan Generating Station's pollution add up to an estimated $255 million a year in health care expenses that are passed on to the public, according to the independent Clean Air Task Force. http://www.catf.us/coal/problems/power_plants/existing/map.php?state=New_Mexico (last visited October 11, 2011).

7.      In its effort to keep San Juan Generating Station running without adequate pollution controls, PNM has greatly exaggerated the cost of the pollution controls – called selective catalytic reduction ("SCR") – that are needed to meet the EPA's nitrogen oxide limit. The PNM cost estimate, as filed with the EPA, is $908M. 76 Fed. Reg. 52,388, 52,392 (Aug. 22, 2011). According to the EPA, "Over 300 retrofit SCRs have been installed since the early 1990s in the United States. Accordingly, constructability issues are well understood." *Id*. It should therefore cost $345 million to bring San Juan up to the standard set by EPA (0.05 lbs/million BTU) – 62% less than PNM's cost estimates

8.      Regional haze affects a number of Class 1 areas in New Mexico. Bandelier National Monument, Pecos Wilderness, Wheeler Peak Wilderness, and

**DECLARATION OF DAVID VAN WINKLE**               **Page 3 of 5**

San Pedro Parks Wilderness are all located in New Mexico. The Sierra Club and I have strong interests in protection these areas from the ills of haze pollution.

9.      Compared to the toll on our Class 1 areas, as well as on human health exacted by burning coal and the resulting $255 million in health care costs imposed on New Mexico residents it makes perfect economic sense to simply bring San Juan up to the minimum pollution control standard required by the Clean Air Act.

10.     The Sierra Club supports implementation of the nitrogen oxide (NOx) limit of 0.05 lbs/million BTU.

11.     The Sierra Club seeks to protect clean air to reduce the negative health impacts of SJGS's pollution. Therefore, the Sierra Club and I generally support EPA's regional haze rule and its implementation relative to SJGS. However, the health impacts of NOx pollution, as well as SJGS's broader pollution and environmental footprint, are not directly represented by the EPA. Decisions about energy sources should fully comprehend local health costs but the EPA does not address these concerns.. The Sierra Club and I have attempted to get these health care costs incorporated in PNM's Integrated Resource Plan, which is a guideline for their energy resources for the next 20 years. PNM, however, has persisted in downplaying these health care costs to perpetuate its reliance on SJGS and to

**DECLARATION OF DAVID VAN WINKLE**               **Page 4 of 5**

continue externalizing the costs of SJGS to the broader public.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge. 28 U.S.C. § 1746.

Dated this 13TH day of OCTOBER, 2011.

David Van Winkle

**DECLARATION OF DAVID VAN WINKLE**                    **Page 5 of 5**